DAN DE FARMS, INC v STERLING FARM SUPPLY, INC (ON REMAND)

Docket No. 217413. Submitted June 12, 2000, at Lansing. Decided January 12, 2001, at 9:00 A.M. Submitted on remand October 22, 2001, at Lansing. Decided on remand December 4, 2001, at 9:10 A.M. Leave to appeal sought.

Dan De Farms, Inc., brought an action in the Arenac Circuit Court against Sterling Farm Supply, Inc., the Michigan Department of Agriculture, and Michigan Millers Mutual Insurance Company after Sterling, a licensed grain dealer, failed to make full payment for grain it had purchased on credit from the plaintiff. The plaintiff's action sought recovery under a bond issued by Michigan Millers pursuant to the Grain Dealers Act, MCL 285.61 *et seq.*, to Sterling with the department listed as the beneficiary. The court, Michael G. Baumgartner, J., granted summary disposition for the defendants, ruling that the bonding provisions of the act did not cover the transactions between the plaintiff and Sterling. The plaintiff appealed. The Court of Appeals, after reviewing the legislative history of the Grain Dealers Act, affirmed, holding that the bonding requirements of subsection 7a(1) of the Grain Dealers Act, MCL 285.67a(1), has always applied only to warehouse receipt transactions for bailed grain and that because the transactions in this matter were not warehouse receipt transactions, the bond at issue did not cover the plaintiff. 244 Mich App 278 (2001). The plaintiff sought leave to appeal to the Supreme Court, which, in lieu of granting leave to appeal, vacated the decision of the Court of Appeals on the basis that the Court of Appeals had considered extratextual evidence of legislative intent without first finding an ambiguity in the statutory language, and remanded the matter to the Court of Appeals with instructions that the Court may engage in judicial construction only if it determines that the statutory language is ambiguous. 465 Mich 872 (2001).

On remand, the Court of Appeals *held*:

1. MCL 285.67a, as it existed during the period relevant to this case, was ambiguous with regard to whether the bonding requirements of that statute apply to all grain dealers for all transactions or only to warehouse receipt transactions for bailed grain.

2. The statute having been found to be ambiguous and in need of judicial interpretation, including examination of extratextual evidence of legislative intent, the language and reasoning of the original opinion of this Court in this matter is readopted.

3. The bonding requirements of subsection 7a(1) of the Grain Dealers Act, MCL 285.67a(1), despite amendments that changed its wording, have always applied and continue to apply only to warehouse receipt transactions for bailed grain. Because the credit transactions between the plaintiff and Sterling were not warehouse receipt transactions, the bond at issue did not cover the plaintiff.

Affirmed.

AGRICULTURE — GRAIN DEALERS — BONDS.

The bond required for licensure as a grain dealer under the Grain Dealers Act covers only warehouse receipt transactions (MCL 285.67a[1]).

*Abbey & Abbey* (by *Thomas D. Abbey*), for Dan De Farms, Inc.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Randall Whitworth*, Assistant Attorney General, for the Department of Agriculture.

*Willingham & Coté, P.C.* (by *John A. Yeager* and *Curtis R. Hadley*), for Michigan Millers Mutual Insurance Company.

ON REMAND

Before: GAGE, P.J., and HOLBROOK, JR., and SAWYER, JJ.

SAWYER, J. This matter is once again before us, the Supreme Court having vacated our original opinion, *Dan De Farms, Inc v Sterling Farm Supply, Inc*, 244 Mich App 278; 625 NW2d 393 (2001), and having directed us to reconsider this matter in light of *Sun Valley Foods Co v Ward*, 460 Mich 230; 596 NW2d 11

(1999). *Dan De Farms, Inc v Sterling Farm Supply, Inc,* 465 Mich 872; 633 NW2d 824 (2001). Specifically, the Supreme Court concluded that we erred by considering extratextual evidence of legislative intent in interpreting MCL 285.67a(1) without first finding that an ambiguity existed in the statutory language. Although we thought it obvious from our opinion that we found the statute to be ambiguous, we apparently overlooked the requirement that we explicitly state such a finding in our opinion.

Accordingly, we find MCL 285.67a, as it existed at the times relevant to this case, to be ambiguous with regard to whether the bonding requirements of that statute apply to all grain dealers for all transactions or is limited to warehouse receipt transactions for bailed grain. Having found the statute to be ambiguous and in need of examination of extratextual evidence of legislative intent, we readopt our original reasoning and original opinion, the text of which follows:

> Plaintiff appeals as of right from an order of the circuit court granting summary disposition to defendants on plaintiff's action to recover under a bond obtained by a grain dealer pursuant to the Grain Dealers Act, MCL 285.61 *et seq.*; MSA 12.119(1) *et seq.* We affirm.
>
> Plaintiff is a Michigan farm corporation operating in Unionville. Sterling Farm Supply, Inc., was a licensed grain dealer operating from at least 1981 to 1997. Between 1991 and 1995, plaintiff sold over $330,000 worth of beans to Sterling for which plaintiff was not paid. Plaintiff sued, seeking to recover $250,000 from a $50,000 bond acquired by Sterling and issued by Michigan Millers Mutual Insurance Company pursuant to § 7a of the Grain Dealers Act, MCL 285.67a; MSA 12.119(7.1). The Department of Agriculture was made a party to the action because that agency is the listed beneficiary on the bond. Although the bond was

for $50,000, plaintiff sought $250,000 on the basis that the full $50,000 was available for each of the five years Sterling Farm Supply allegedly violated the Grain Dealers Act.

Between 1991 and 1995, plaintiff transferred over $330,000 worth of beans to Sterling. Apparently before November 1995, Sterling issued no paperwork for these transactions. However, on November 22, 1995, Sterling issued a series of "delayed payment agreements" that covered the beans. Each agreement identified the amount of beans covered, the crop that the agreement covered (e.g., the 1991-92 navy bean crop), the price to be paid, and the date payment was to be made. Apparently Sterling made some payments on these agreements, which were characterized as interest.

In April 1996, Sterling filed for chapter 11 bankruptcy protection, but the petition was later converted to a chapter 7 liquidation bankruptcy. Plaintiff originally sought recovery under this bond in the bankruptcy court, which claim was ultimately dismissed for lack of subject-matter jurisdiction by the bankruptcy court. Plaintiff then filed the instant action.

In the instant action, plaintiff alleged that Sterling was a licensed grain dealer and principal on a bond obtained from Michigan Millers. Plaintiff further alleged that Sterling violated the Grain Dealers Act and, therefore, plaintiff is entitled to recovery under the bond issued by Michigan Millers. Specifically, plaintiff argues that it is entitled to recover $50,000 (the face amount of the bond) for each of the five years that the violations occurred, for a total of $250,000.

Ultimately, the trial court granted summary disposition to defendants, concluding that the bonding provisions of the Grain Dealers Act only covered warehouse-receipted produce and that this case involved credit sales with promissory notes, not warehouse receipts for bailed grain. The court also granted summary disposition in favor of Michigan Millers on the grounds that plaintiff was not a third-party beneficiary on the bond.

Plaintiff first argues that the trial court erred in holding that the bond provision of MCL 285.67a(1); MSA 12.119(7.1)(1) applies only to warehouse receipt holders.

We disagree. At the times relevant to this case, that statute provided as follows:

"An application for a grain dealer's license shall be made on a form provided by the director, shall be filed 30 days in advance of a license expiration date if there is an outstanding license, and shall be accompanied by a sufficient bond on a form provided by the director or an irrevocable letter of credit on a form provided by the director in favor of the department of agriculture which fulfills the requirements of subsection (4). The bond shall run to the department of agriculture with sufficient surety conditioned for the faithful performance of the duties of a grain dealer and compliance with all laws of this state relating to grain dealers. The amount of the bond for a grain dealer who is a bailee of farm produce or who issues warehouse receipts shall be $15,000.00 for the first 10,000 bushels of storage capacity of the grain dealer, plus $5,000.00 for each additional 10,000 bushel capacity or fraction of that capacity used for the storage of warehouse receipted farm produce. The amount of the bond for a grain dealer who does not own a farm produce storage or handling facility or does not own a vehicle used to transport farm produce shall be $50,000.00."

The quoted version of the statute reflects the wording of the statute from 1982 until 1998.[1] It does not appear to be disputed that, before the 1982 amendments, the Grain Dealers Act would not support plaintiff's position. The pre-1982 version of the statute specifically provided that "a grain dealer need not be bonded if he is not a bailee of farm produce or does not issue warehouse receipts." That would clearly suggest that the bond was designed to protect those two types of farmers: bailors of grain and holders of warehouse receipts.

Similarly, in amendments adopted in 1998, the act once again clearly provides that the bond shall "apply only to warehouse receipt transactions." However, we are not dealing with either the pre-1982 or post-1998 versions of the

---

[1] The quoted version reflects amendments made in 1988 and 1992. Those amendments, however, do not materially affect the issue under consideration here.

statute. Rather, at issue is the effect of the 1982 amendments on this case.

The 1982 amendments modified the statute in a number of ways. Most relevant to this case is the fact that the amendments deleted the provision that a grain dealer need not be bonded if he is not a bailee of farm produce or does not issue warehouse receipts. Specifically, it deleted the following phrase: "except that a grain dealer need not be bonded if he is not a bailee of farm produce or does not issue warehouse receipts." On the surface, this amendment would suggest that the Legislature intended to extend the bond requirements to all grain dealers, not just those who are bailees and issuers of warehouse receipts, thus extending the protection of the bonds to sellers of grain, not just bailors of grain. Indeed, it is tempting to say that, whether the Legislature so intended or not, that is what it achieved.

However, there is some evidence to suggest that the Legislature did not intend to make such a change. First, the Department of Agriculture argues that it has consistently interpreted the Grain Dealers Act to require bonding only by dealers who bail grain and issue warehouse receipts. The department argues that the courts should give due deference to its interpretation of the act. This interpretation is further supported by the fact that the bond, apparently supplied by the Department of Agriculture, is entitled "Grain Dealers Bond for Warehouse Receipted Farm Produce."

Second, the Department of Agriculture argues, very convincingly, that deletion of the sentence stating that grain dealers who are not bailees or issuers of warehouse receipts need not be bonded merely was replaced by a different phrase in the 1982 version of the statute. In the pre-1982 version of the statute, the provisions for the amount of the bond was introduced with the phrase "[t]he amount of the bond shall be . . . ." In the 1982 version, that phrase was re-written to read: "The amount of the bond for a grain dealer who is a bailee of farm produce or issues warehouse receipts shall be . . . ." Thus, it is not so much that the Legislature deleted the provision that only bailees and issuers of warehouse receipts had to be bonded as it is that it

streamlined the statute by combining two sentences into one.

This analysis does not completely address the fact that the 1982 amendment also added a provision that a grain dealer who does not own a farm produce storage or handling facility or a vehicle used to transport farm produce must post a $50,000 bond. At first blush, it would appear that this provision would extend the bond requirements beyond bailees and issuers of warehouse receipts because those grain dealers who do bail grain would, of necessity, have to have storage facilities. However, Michigan Millers supplies a credible rationale. That requirement was added to cover grain dealers who accept bailed grain and issue warehouse receipts, but physically store the produce at a location owned by someone else. That is, someone who is essentially a broker for grain storage. Under the prior statute, such a dealer could escape the bonding requirement.

Third, under the 1982 amendment, the amount of the bond was based on the storage "capacity used for the storage of warehouse receipted farm produce." This factor reinforces the idea that the bonding requirement was intended to apply only to bailed produce. The reason is demonstrated by this example: Assume that a grain dealer has a storage capacity of 100,000 bushels. If all that capacity is designated for the storage of bailed or warehouse-receipted grain, then the dealer would be obligated to post a $60,000 bond. However, under the formula in the statute, if the dealer did not bail grain or issue warehouse receipts, and used that storage capacity solely for grain he had purchased (either as a cash sale or under a price later agreement), the amount of bond required would be zero. Accordingly, we conclude that the bonding requirement does not cover grain purchased under either a cash sale (with delayed payment) or under a price later agreement.

Fourth, it is not at all clear that the legislative intent behind the 1982 amendments was to extend the bond protections to grain sale transactions. In reviewing the Legislative Service Bureau's analysis of the bill that became 1982 PA 33, there is little to suggest that it was the clear intent to extend the bonding requirement to protect sellers of grain

on credit. Although the analysis notes that the amendment would delete the "provision exempting grain dealers from bonding if they are not bailees or do not issue warehouse receipts," it does not clearly state why that deletion was made (which would be consistent with the idea above that the provision was included elsewhere in the statute and, thus, there was no change in law meriting discussion).

Rather, the legislative analysis suggests that the primary impetus for the 1982 amendments was two-fold. First, to increase the record-keeping requirements of grain dealers so that the Department of Agriculture could more easily and quickly recognize that a grain dealer was in financial trouble and headed for bankruptcy. Second, the amendments were intended to curb abuses of price later agreements by increasing the security required for such agreements.[2]

What is lacking in the legislative analysis is any strong indication of an intent to protect farmers who sold to grain dealers on credit, such as the case at bar. Indeed, the very opening of the analysis indicates that the act covers three types of transactions: *"cash sales*; transactions in which a dealer issues a *warehouse receipt* to a farmer for produce accepted for storage in the dealer's facilities; and transactions involving *price later agreements* which allow dealers to take possession of grain without paying for it with the stipulation that the farmer can receive payment when market prices are more favorable than those that prevail at the

---

[2] The situation with the price later agreement is, briefly, as follows. Farmers would deliver grain to an elevator at harvest time. Because there is, obviously, a huge increase in supply of the produce at harvest time, that is the time of the year when prices are at their lowest. Consequently, under price later agreements, while the grain is delivered at harvest time and the dealer takes title to the grain, the price is not actually set until sometime in the future when grain prices are more favorable to the farmer. Apparently, the problem lay in the fact that grain dealers did not adequately guard against unfavorable price changes or made speculative investments in the commodities futures market, rendering them unable to meet their obligations to the grower when the time came to settle up the sale. The 1982 amendments were designed to increase the security a grain dealer had to have on deposit to ensure his ability to meet his obligations to the farmers.

time of delivery—harvest time—when prices are often at their lowest." The transaction in the case at bar does not fit any of those categories. This was a sale on credit.[3]

For that matter, as discussed above, the bonding requirements do not cover price later agreements. Rather, subsection 2 of the statute establishes separate security requirements for price later agreements. Those provisions include keeping the grain in the dealer's inventory by storing it at the dealer's facility, bailing it at another dealer's facility (with a warehouse receipt), or selling it to another dealer under a price later agreement. For grain not maintained in the dealer's inventory, the dealer must maintain cash or other secured investments to cover eighty percent of the grain not in inventory (along with a purchase commitment covering the grain deficiency). This latter requirement suggests the purpose behind the security requirements for price later agreements, i.e., to provide an assurance that the dealer can meet the price of the grain when it comes time under the price later agreement to set the price. How is this ensured? By requiring the grain dealer to either keep the grain in storage (in his own facility or elsewhere, but with title retained), have his own price later agreement with another dealer, or by procuring a futures contract to ensure the ability to repurchase the grain (and allow for it to be sold at the market price when the price is set under the price later agreement).

However, while the statute imposes obligations on a dealer to protect against unfavorable price changes, it does

---

[3] We note that plaintiff characterizes this case as involving a price later agreement, as does the Department of Agriculture. It is not clear to us that that is the case. The documentation referred to in support of this claim is referred to as a "Delayed Payment Agreement." Those agreements are not price later agreements because the price is fixed in those agreements. In fact, some of those agreements cover produce from harvests three or four years before the date of the agreement. Therefore, it is not clear whether the produce was originally sold under a price later agreement or not. In any event, it would appear that the date for setting the price, even if the sales were originally under price later agreements, had arrived by the time of the execution of the Delayed Payment Agreements and, therefore, the transactions were no longer price later sales and were now credit sales.

not impose a bonding requirement to ensure that the dealer does, in fact, retain the grain or otherwise comply with the provisions of the statute. How, then, would a farmer under a price later agreement be protected? In 1984, the statute was amended to add a provision, currently found in subsection 6, requiring a grain dealer to grant a security interest in the grain upon demand of the farmer selling under a price later agreement—the traditional way a seller is protected in a credit sale.

Finally, we note that the legislative analysis for the 1998 amendment of the statute (1998 PA 388) is helpful. This amendment added to subsection 1 the provision that the bond would apply "only to warehouse receipt transactions." The legislative analysis of the bill identified the reason for the amendment as being to address a problem of a difference between how the Department of Agriculture applied the bonding requirement and how some courts (apparently the bankruptcy court in particular) interpreted the statute.

It could be argued that the 1998 amendment indicates that the 1982 amendment did, in fact, inadvertently extend the bonding requirement (and therefore the protections of the bonds) to all grain transactions. We think, however, that the better view is that the 1998 amendment merely clarified the consistent intent of the Legislature that the bonding requirement apply only to warehouse receipt transactions (for the reasons discussed earlier). The 1998 amendment served not to change the meaning of the statute, but to make its existing meaning clearer in light of misinterpretation by the bankruptcy court.[4]

With all due respect to the federal bankruptcy court, our view is that MCL 285.67a; MSA 12.119(7.1) imposes only, and ever did impose only, a bonding requirement to cover warehouse receipt transactions for bailed grain. Because the case at bar does not involve a warehouse receipt transaction, it does not come within the coverage of the bond. Accordingly, the decision of the trial court is affirmed.

---

[4] Note, such a bankruptcy court ruling can be found in *In re Mayville Feed & Grain, Inc,* 96 Bankr 755 (ED Mich, 1989).

The resolution of the above issue renders it unnecessary to consider plaintiff's other issue, whether plaintiff had the right to enforce the bond as either a direct or third-party beneficiary or whether plaintiff is entitled to a remand to amend its complaint to seek mandamus directing the department to seek recovery under the bond.

Affirmed. Defendants may tax costs.